**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DIRECTV, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 03-2287-CM** |
| | ) | |
| **WILLIAM TURNER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

Plaintiff DIRECTV, Inc. brings this case, alleging that defendant William Turner surreptitiously

intercepted and decrypted DIRECTV's satellite signals, ultimately to gain free viewing of satellite television

programming.  The Honorable G. Thomas VanBebber held a bench trial on April 5, 2005.  After the

untimely death of Judge VanBebber, the parties agreed that this court could decide the case based on the

trial transcript and the evidence admitted at trial.

The central issue in this case is credibility.  DIRECTV has evidence linking defendant to the

purchase of numerous "pirate access" devices, or devices designed to assist illegal interception of

DIRECTV satellite signal.  Defendant contends that although the purchases bear his name, address, and

other personal information, he was not involved in the transactions.  According to defendant, his former

roommate probably is the culpable party.

The court is now prepared to issue its findings of fact and conclusions of law in accordance with

Fed. R. Civ. P. 52(a).  For the reasons set forth below, the court concludes that DIRECTV is entitled to

judgment in the amount of $10,000.

## FINDINGS OF FACT

### Background - DIRECTV

1.    DIRECTV distributes satellite programming to satellite dish owners who pay subscription fees and

obtain a license to use the service.

2.    DIRECTV's satellite systems are also referred to as "DSS."

3.    DIRECTV encrypts its satellite programming to prevent unauthorized access.  DIRECTV

authorizes receipt of its programming through the use of legally programmed access cards.

4.    DIRECTV's customers use satellite receivers and the access cards to unscramble the

programming.  Each DIRECTV access card contains an embedded microprocessor and uses

smartcard technology to (1) control which DIRECTV programming the receiver descrambles; and

(2) capture and transmit to DIRECTV the subscriber's pay-per-view information.

5.    DIRECTV has issued several types of access cards.  DIRECTV issued "period 2" access cards,

a/k/a "H" cards, until October 2002.  DIRECTV then issued "period 3" access cards, a/k/a "HU"

cards, until April 2004.

6.    DIRECTV incurs significant expense to acquire the rights to distribute its television programming

and service.

7.    Piracy of DIRECTV's signal has affected DIRECTV immeasurably.  An individual using one

pirated access card has free access to over a million dollars in annual programming services,

counting the value of every pay-per-view movie, even though the same movie is shown several

times a day.  Even calculating the value of services more conservatively, DIRECTV calculates the

-3-

value at well over $150,000 annually, using the value of all subscription packages and movies

viewed once.

8.     Before bringing this lawsuit, DIRECTV sent defendant a demand letter on September 13, 2002.

## Background - Defendant William Turner

9.     Defendant resided at 8734 W. 70th Street, Merriam, Kansas 66204 during the years 1998 through

2002.  His phone number during that time period was 913-236-4879.

10.    Defendant canceled his Time Warner cable television account on September 14, 1998.  No

evidence was introduced at trial that defendant otherwise subscribed to television service after that

time.

11.    Mike Morris was one of defendant's roommates beginning in November 2000.  Although

defendant indicated in deposition that Mr. Morris moved out in November 2001, defendant

testified at trial that Mr. Morris moved out in April 2001.  The court finds defendant's trial

testimony consistent with defendant's representation that he has not spoken with Mr. Morris since

April 2001.

12.    Defendant has neither spoken to nor attempted to speak to Mr. Morris regarding DIRECTV's

claims against him.

13.    Within the last five years, defendant used lisajean@swbell.net and lisajean@everestkc.net as his

email addresses.

14.    Defendant created an eBay account on November 2, 2000.  Ebay is a service where persons can

buy or sell goods on the Internet.  Defendant's eBay account is in the name of William B. Turner,

6720 Larsen Lane, Shawnee, Kansas 66203-3832 (which was defendant's address after he

moved from 8734 W. 70th Street); telephone number 913-268-4978; email address

lisajean@everestkc.net; user name "billt1962."

15. Defendant also has had a Paypal account since September 23, 2000.  Paypal is a service that

facilitates commercial transactions over the Internet.  The account is in the name of "william turner";

home telephone number 913-268-4978; work telephone number 913-383-4100; email address

lisajean@everestkc.net.  The account also lists a prior residential address of 8734 W. 70th Street.

16. Defendant uses "billt" or "billt1962" as his Internet website screen names.  Defendant is not aware

of other persons using his screen name of "billt" on the Internet.  When defendant uses message

boards or certain websites, he does so under the name of "billt."

17. According to defendant, he thinks that his roommates used his credit card to make purchases four

or five times.

18. According to defendant, he taped his user names and passwords to the computer, giving anyone

using the computer access to them.

### Pirate Access Device Definitions

19. "Unloopers," which are also known as "loaders," are designed to restore functionality to illegally

modified DIRECTV access cards that were disabled by misuse or by DIRECTV's electronic

security measures – Electronic Counter Measures or "ECMs."

20. DIRECTV sends ECMs by satellite to disable illegally modified DIRECTV access cards that are

being used to receive unauthorized DIRECTV programming.  Once these cards are disabled, or

"looped," they no longer allow free viewing of DIRECTV programming without using other

electronic devices or equipment to return the illegal functionality.

-5-

21.     Because unloopers and loaders repair disabled access cards, the purchase of an unlooper or loader

indicates that interception of DIRECTV satellite communications had occurred prior to the date of

the purchase.

22.     The Vector Super Unlooper with SU2 code is primarily designed to surreptitiously intercept

DIRECTV's programming.  "SU2" code and "X" code are programs or software used with

unloopers, and are designed primarily to aid interception of DIRECTV's satellite communications.

23.     "3M" software is "script" software used to modify DIRECTV access cards so that they can be

used to intercept DIRECTV satellite communications.

### Purchases of Pirate Access Devices

24.     Defendant made the following purchases of pirate access devices:

   a.     An "unlooper with x chip" purchased for $165 using his Paypal account on September 23,

          2000;

   b.     A Wildthing X Chip from Smart Card Solutions[1] shipped on or about March 31, 2001;

   c.     A Vector Super Unlooper with SU2 code from Vector Technologies purchased for $129

          on or about April 9, 2001;

   d.     An "ALL in one loader" purchased for $114 on November 8, 2001;

   e.     "HU 3M support for 3 months" purchased for $24 on November 23, 2002 and not

          disputed by defendant; and

   f.     "HU 3M support for 1 year" purchased for $69 on February 12, 2003 and not disputed by

------

[1] DSSPRO, a/k/a "Smart Card Solutions," and Vector Technologies, a/k/a "Global Card Programmers," were businesses that marketed and sold devices and computer software used to illegally access DIRECTV programming.

defendant.

25.     The devices and/or software purchased by defendant were shipped to and received by defendant at

his address. *See Witt v. Roadway Express*, 136 F.3d 1424, 1429-30 (10th Cir. 1998) (holding

that a rebuttable presumption of receipt arises when properly addressed mail is placed in the postal

services's care).

### Purchase/Sale of DIRECTV Equipment

26.     Although defendant testified he never possessed DIRECTV equipment, his eBay and Paypal

accounts show numerous transactions involving the purchase and sale of DIRECTV-related

equipment.

27.     Defendant's eBay account evidences the following purchases of DIRECTV-related equipment:

a.      "DSS Receiver w/remote, dish and good h card" for $335 on November 3, 2000, or one

day after defendant's eBay account was created;

b.      "2 RCA RECEIVERS W/REMOTES AND 2 H-CARDS" for $595 on November 5,

2000, or three days after defendant's eBay account was created;

c.      "dss RCA SYSTEM 4120 NEW" for $55.99 on November 22, 2000;

d.      "HUGHES DSS SYSTEM WITH VALID H CARD" for $300 on December 9, 2000;

and

e.      "2/HUGHES/SILVER/DSS/SYSTEMS/W/DUAL/LNB" for $130 on January 16, 2001

28.     Defendant's eBay account evidences the following sales of DIRECTV-related equipment:

a.      "Dss Systems DTV 3 complete" for $175 on June 16, 2001;

b.      "DSS Systems" on June 16, 2001;

-7-

    c.        "DSS DTV System" for $135 on June 23, 2001;

    d.       "2 DTV dss systems" for $150 on June 23, 2001;

    e.       "2 DTV dss systems" for $150 on June 23, 2001;

    f.        "2 DTV dss systems" for $150 on June 23, 2001;

    g.       "2RCA DSS system with H cards" on July 2, 2001; and

    h.       "HUGHES 2 ROOM SYSTEM MODEL E-11" for $175 on August 5, 2001.

29.    In a transaction dated July 9, 2001, defendant's Paypal account evidences receipt of $250 for "2 complete dss sat. sys/w h cards."  Accompanying the payment was a message stating "ok, bill here it is thanks!"

30.    Later that same date, the $250 received by defendant's Paypal account for the "2 complete dss sat. sys/w h cards" was credited to defendant's own United Missouri Bank account linked to his Paypal account.

31.    Defendant is not aware of repaying his roommates for the funds he received through his Paypal account.

**Pirating Websites**

32.    Defendant also joined websites dedicated to the distribution of software and information used to gain unauthorized access to DIRECTV programming.  On August 21, 2000, an account under the email address of "lisajean@swbell.net" and the screen name of "billt" was established on www.pirateden.com.  On August 13, 2002, an account under the email address of "lisajean@everestkc.net" and the screen name of "billt" was established on www.dsshideout.com.  On November 30, 2002, an account under the email address of "lisajean@everestkc.net" and the

-7-

screen name of "billt" was established on www.decodernews.com.

33.    The Pirate Den, or www.pirateden.com, was a website with over 100,000 members, where people

could learn "everything they need to know about DIRECTV piracy," according to William Gatliff,

who testified at trial about methods for illegally receiving DIRECTV programming.

34.    These websites included chat rooms where users could post information on such matters as the

latest ECMs launched by DIRECTV and software "patches" and "fixes" to resurrect illegally

modified DIRECTV access cards that had been disabled by ECMs.

35.    In some cases, websites did not sell any piracy technology themselves.  Rather, they provided

information and links to other piracy web sites that sell piracy technology and related services to

permit customers to unlawfully obtain DIRECTV's programming.

**Defendant's Credibility**

36.    Defendant's explanations of why he was not involved in each of the above transactions are not

credible.

a.    Every transaction involving pirate access devices and software references defendant's

name, address, telephone number, email address, credit card numbers and/or bank

accounts.

b.    Despite the fact that these devices and software are relatively expensive, defendant claims

that he does not recall their purchase.  He also has no record of who made the purchases,

and does not appear to have made any effort to discover who made the purchases.  For

instance, when asked whether his wife made the purchases, he responded, "I doubt it."

c.    Defendant stated in deposition that it would be "sheer speculation" for him to know who

was involved in the piracy equipment transactions, but defendant believes it was Mr.

Morris.  Despite this belief, defendant has never attempted to contact Mr. Morris after

becoming aware of the claims made against him, and does not recall discussing issues about

DIRECTV piracy with Mr. Morris while the two lived together.  Moreover, neither Mr.

Morris nor any other person testified at trial to corroborate defendant's assertions.

d.      Some of the pirate access devices were purchased before and after Mr. Morris moved out

of defendant's house.

e.      Defendant's email address and screen name were used to join Internet piracy websites

before and after Mr. Morris moved out of defendant's house.  Notably, defendant was

elevated to "premium" member status on the Decoder News website.  Although defendant

admitted in trial that he joined a couple of websites after first hearing from DIRECTV about

this lawsuit, the Pirate Den account was established well before any of the events in this

lawsuit transpired – August 2000.

f.      The court finds it improbable that someone else created a Pirate Den account using

defendant's screen name and email address.

g.      Defendant admitted purchasing computer software support for software primarily designed

for the surreptitious interception of DIRECTV's programming.  Although he claims that he

made the purchases out of curiosity after DIRECTV sent him the demand letter, this

rationale does not explain why he made two purchases – one for three months of service,

and another for one year of service.  Notably, the one-year contract was purchased when

the three-month contract was about to expire.

h.     The first transactions under defendant's eBay and Paypal accounts – which, significantly, were made almost immediately after defendant created the accounts – related to pirate access products and DIRECTV.  The court finds it improbable that someone else would use defendant's accounts immediately after defendant created them, making purchases before defendant himself even had the opportunity to make purchases.

i.     Defendant's Paypal account reflects payment to defendant with the comment of "ok, bill here it is thanks!" for the sale of DIRECTV satellite television systems with "H" cards after DIRECTV no longer legitimately activated such cards.

j.     Defendant repeatedly testified differently in trial than he had in deposition.  For example, in deposition, he testified that he had never sold on eBay.  At trial, he admitted that he had made some sales on eBay.  In deposition, he testified that when he first received a demand letter from DIRECTV, he threw it away.  At trial, he testified that he called the number on the back of it to ask "what it was about."  When confronted with the inconsistency, he then clarified that he did throw the letter away after he talked with "them."

k.     Defendant testified that he let his roommates use his credit card for Internet purchases.  But many of the purchases and sales at issue were linked directly to defendant's UMB bank account.  The court finds it unlikely that defendant gave his roommates direct access to his bank account.

## Sufficiency of the Evidence

37.    The court finds it unlikely that defendant would deny that he was involved in the aforementioned transactions unless he knew that he was violating the law in some way.  For this reason, as well as

the reasons previously stated, the court finds that the circumstantial evidence in this case supports a

finding that defendant used the devices and software he purchased to illegally intercept DIRECTV's

signal.  *See DIRECTV, Inc. v. Hosey*, 333 F. Supp. 2d 1102, 1107 (D. Kan. 2004) (holding that

DIRECTV may rely on circumstantial evidence to show that the defendant received or intercepted

its communication).

38.     The evidence also supports a finding that defendant intentionally used or attempted to use

        DIRECTV's signal, knowing or having reason to know that he was obtaining the information

        through illegal means.

39.     The court finds that the circumstantial evidence is not strong enough, however, to find that

        defendant distributed the devices that he purchased.  Although defendant purchased four pirate

        access devices, the record does not show that he resold those devices.  *See DIRECTV, Inc. v.*

        *Neznak*, 371 F. Supp. 2d 130, 133 (D. Conn. 2005) (holding that purchases of five pirate access

        devices within three months did not require the court to infer that defendant distributed four of the

        five devices).  *But see Cablevision of S. Conn., Ltd. P'ship v. Smith*, 141 F. Supp. 2d 277, 287

        (D. Conn. 2001) (inferring that nineteen of twenty devices purchased by defendant were resold to

        others).  The court finds it significant that, despite the other substantial evidence of defendant's

        purchasing and selling activities, DIRECTV has not produced evidence that defendant actually sold

        the pirate access devices.

40.     At most, the record shows that defendant bought and sold numerous DIRECTV systems.  The

        court does not find sufficient evidence that defendant helped those who bought his DIRECTV

        systems to illegally access programming, or that he sold them modified access cards that are not

reflected in the records before the court.

41.    If defendant is not enjoined from receiving and divulging or publishing DIRECTV's satellite

programming, DIRECTV will continue to be caused irreparable and imminent harm.

## CONCLUSIONS OF LAW

1.    47 U.S.C. § 605(a) states that "[n]o person not being entitled thereto shall receive or assist in

receiving any interstate or foreign communication by radio and use such communication (or any

information therein contained) for his own benefit or for the benefit of another not entitled thereto."

2.    Section 605(e)(4) creates liability against "[a]ny person who manufactures, assembles, modifies,

imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment,

knowing or having reason to know that the device or equipment is primarily of assistance in the

unauthorized decryption of satellite cable programming, or direct-to-home satellite services. . . ."

3.    Section 605(e)(3) provides a civil remedy for any person aggrieved by violations of §§ 605(a) or

605(e)(4).

4.    18 U.S.C. § 2511(1)(a) makes criminal the acts of "intentionally intercept[ing], endeavor[ing] to

intercept, or procur[ing] any other person to intercept . . . electronic communication," among other

acts.

5.    18 U.S.C. § 2520(a) creates a civil cause of action for violations of § 2511, by providing that "any

person whose wire, oral, or electronic communication is intercepted, disclosed or intentionally used

in violation of this chapter may in a civil action recover from the person or entity which engaged in

that violation such relief as may be appropriate."

6.    Because the alleged § 605(a) and § 2511(1)(a) violations involve overlapping evidence, the court

-12-

will consider the violations together. *See DIRECTV, Inc. v. Rados*, 2004 U.S. Dist. LEXIS

259000, at \*12-14 (M.D. Tenn. Sept. 9, 2004).

7.      DIRECTV's satellite transmissions constitute radio communications, and DIRECTV qualifies as

"any person aggrieved" within the meaning of § 605. *See Int'l Cablevision v. Sykes*, 75 F.3d

123, 132-33 (2d Cir. 1996); *Cal. Satellite Sys. v. Seimon*, 767 F.2d 1364, 1366-67 (9th Cir.

1985).

8.      When defendant accessed DIRECTV programming without authorization, he violated 47 U.S.C. §

605(a).

9.      When defendant received and used DIRECTV's programming, defendant violated 18 U.S.C. §

2511. *See DIRECTV, Inc. v. Nicholas*, 403 F.3d 223, 226 (4th Cir. 2005); *DIRECTV, Inc. v.*

*Gilliam*, 303 F. Supp. 2d 864, 872 (W.D. Mich. 2004).

10.     Because the court finds that defendant did not distribute devices which were to be used primarily in

the assistance of the unauthorized decryption of DIRECTV's programming, defendant did not

violate 47 U.S.C. § 605(e)(4). DIRECTV did not provide evidence or argument supporting a

finding that defendant violated § 605(e)(4) in any other manner.

11.     DIRECTV is entitled to a statutory award of $10,000 per violation of 47 U.S.C. § 605(a) and 18

U.S.C. § 2511. *See* 47 U.S.C. § 605(e)(3)(C)(II) (providing for $1,000 to $10,000 statutory

damages for violation of subsection (a)); 18 U.S.C. § 2520(c)(2) (providing for discretionary

statutory damages of $100 a day or $10,000 per violation); *Smith*, 141 F. Supp. 2d at 286

(holding that the court should award damages pursuant to the more severe damage provisions

where the defendant violates two statutes).

-13-

12.    The court finds that a statutory award of $10,000 is reasonable.  Defendant purchased his first

unlooper on or about September 23, 2000.  It is therefore logical to conclude that defendant

intercepted DIRECTV programming for at least thirty months, ending shortly after his last purchase

of a year's worth of 3M software support in February 2003.  *See  DIRECTV, Inc. v. Best*, 2004

WL 547113, at \*2 (N.D. Ill. Feb. 26, 2004); *King Vision Pay-Per-View Ltd v. Spice Rest. &*

*Lounge*, 244 F. Supp. 2d 1173, 1179 (D. Kan. 2003) (assessing damages based on what the

defendants would have been charged by the plaintiff for viewing television programming under 47

U.S.C. § 605).  Although DIRECTV estimates the value of its services at over $150,000 annually,

the court finds that this amount does not represent a reasonable award.  The court estimates that a

$200-$300 monthly bill is a more realistic average bill for a paying customer.  *See Best*, 2004 WL

547113, at \*2 (observing that DIRECTV had shown a typical monthly loss of $205 for the illegal

use of its signal).  If defendant had spent $200-$300 for thirty months, DIRECTV would have

received approximately $6,000-$9,000 from defendant.  The court also finds it significant that

defendant possessed more than one pirate access device.  This indicates to the court that an award

at the low end of the statutory range is not appropriate.

13.    DIRECTV has demonstrated irreparable injury for which there is no adequate remedy at law.  The

court also finds that defendant's unlawful acts are inconsistent with the public interest embodied in §

605.  Injunctive relief is therefore appropriate to prevent defendant from violating 47 U.S.C. §

605(a) in the future.  *See* 47 U.S.C. § 605(e)(3)(B)(i).

**IT IS THEREFORE ORDERED** that judgment be ordered in favor of DIRECTV in the amount

of $10,000.

**IT IS FURTHER ORDERED** that defendant is enjoined from violating 47 U.S.C. § 605(a) in

the future.

Dated this 13th day of July 2006, at Kansas City, Kansas.


s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**